UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JASON SAVARESE                          CIVIL ACTION

VERSUS                                  NO: 09-129

PEARL RIVER NAVIGATION, INC.            SECTION: R(5)


**ORDER AND REASONS**

Before the Court is defendant Pearl River Navigation, Inc.'s motion for an adverse inference due to plaintiff Jason Savarese's destruction of physical evidence--the condition of Savarese's neck.[1]  For the following reasons, the Court DENIES Pearl River's motion.


I.    **BACKGROUND**

On November 15, 2008, plaintiff Jason Savarese allegedly fell and suffered injuries while on board the M/V CHARLES K, a vessel owned and operated by defendant Pear River.  Savarese alleges that he suffered "serious, permanent and painful injuries to his spine and lower extremities."[2]

After the accident, Savarese visited the Pelican Urgent Care Center, where he complained of pain in his lower spine, right

_____

[1]    (R. Doc. 24.)

[2]    (R. Doc. 1.)

hip, and right knee.[3]  The attending physician ordered an x-ray

of Savarese's lower spine, right hip, and right and left knees.[4]

The lumbar spine x-ray revealed no fractures, but mild scoliosis

and a 1 cm ossification, which the x-ray report attributed to "an

old fracutre."

On November, 19, 2008, Savarese visited Dr. Mark J. Hontas,

an orthopedic surgeon at Tulane University.[5]  Hontas reported

that Savarese complained of pain in his lower back, right hip,

right knee and right foot.  Hontas also noted that Savarese could

not put weight on his right leg and had tenderness around his

right knee.[6]  Hontas diagnosed Savarese with a right knee

contusion, ordered an MRI, and started Savarese on a physical

therapy regimen.[7]  In his deposition, Hontas also stated that to

the extent Savarese complained of neck or back problems, Hontas'

office staff would have told Savarese that Hontas does not treat

spinal injuries.[8]

On December 6, 2008, Savarese visited Dr. Morteza Shamsnia.

Shamsnia noted that Savarese suffered from low back pain, neck

---

[3]    (R. Doc. 31, Ex. A.)

[4]    (R. Doc. 31, Ex. A.)

[5]    (R. Doc. 31, Ex. B.)

[6]    *Id.*

[7]    *Id.*

[8]    (R. Doc. 31, Ex. C., Hontas Dep. at 23.)

pain, and right knee pain.[9]  Shamsnia also noted that Savarese

was being seen by a different treating physician for his knee

pain.[10]  Shamsnia concluded his report by stating that Savarese's

symptoms "are causally related to [Savarese's] accident of

11/15/2008."[11]  Savarese did not notify Pearl River of his visit

with Shamsnia.[12]

On December 16, 2008, Hontas noted in a letter to Pearl

River that Savarese had eight to ten degrees of motion in his

right knee and is not responding to physical therapy.[13]  On

January 7, 2009, Hontas further noted in a letter to Pearl River

that Savarese will likely require surgery on his right knee.[14]

Hontas did not mention Savarese's back or neck condition in

either letter.[15]

On January 16, 2009, Hontas performed a knee scope and

microfacture surgery on Savarese.[16]  On a pre-anesthetic

questionnaire, Savarese noted that he had limited neck motion and

---

[9]    (R. Doc. 31, Ex. D.)

[10]   (R. Doc. 31, Ex. D.)

[11]   (R. Doc. 31, Ex. D.)

[12]   (R. Doc. 24.)

[13]   (R. Doc. 24, Ex. B., Dec. 16 letter.)

[14]   (R. Doc. 24, Ex. B., Jan. 7 letter.)

[15]   *Id.*

[16]   (R. Doc. 31, Ex. F; R. Doc. 24, Ex. B., Feb. 4 letter.)

pain in his neck.[17]  Savarese did not note any other medical

issues on the pre-anesthetic questionnaire.[18]

On February 10, 2009, Savarese underwent an MRI scan of his

back and neck.[19]  The scan summary found that Savarese had "broad

based" herniation of the disc between the two vertebrae in his

neck.  In an office note on March 3, 2009, Dr. Bradley J.

Bartholomew, a member of Shamsnia's practice group, stated that

he agreed with the MRI report and that Savarese suffered from a

"large herniation" of the intervertebral disc in his neck and

would be a good candidate for surgery.[20]

In a letter dated March 6, 2009, Hontas wrote a letter to

Pearl River in which he stated that Savarese's condition was

improving, and that Savarese "does not have any pain at all."[21]

Hontas also noted that Savarese is seeing Shamsnia, and that

Shamsnia was keeping Savarese out of work until he could

reevaluate him.[22]

On April 7, 2009, Savarese notified Pearl River that he

would undergo neck surgery performed by Bartholomew at a date to

---

[17]    (R. Doc. 31, Ex. F.)

[18]    *Id.*

[19]    (R. Doc. 31, Ex. L.)

[20]    (R. Doc. 31, Ex. L.)

[21]    (R. Doc. 24, Ex. B., March 6, letter.)

[22]    *Id.*

be determined.[23]  The letter also noted that Pearl River may conduct a "presurgery evaluation" if it so chose.[24]

On April 10, 2009, Pear River responded that Savarese had "breached his maintenance and cure obligation to provide timely notice of request and approval for medical treatment."[25] Moreover, Pearl River stated that "there is nothing in Pearl River's investigation of this incident which would even remotely suggest a neurologic injury" and that Pearl River "is unable to determine what type of further evaluation would be required."[26]

On May 19, 2009, Savarese notified Pearl River that he would undergo "emergency" surgery on his neck the next day.[27]  Pearl River responded to Savarese on May 20, 2009, stating that Savarese had ignored Pearl River's request for medical records, and as a result Pearl River would deny Savarese's claim for maintenance and cure.[28]

Savarese filed this lawsuit on January 15, 2009.  Savarese claims that his November 15, 2008 accident was the result of Pearl River's negligence.  In addition to general and specific

---

[23]    (R. Doc. 24, Ex. D.)

[24]    (R. Doc. 24, Ex. D.)

[25]    (R. Doc. 24, Ex. E.)

[26]    *Id.*

[27]    (R. Doc. 24, Ex. F.)

[28]    (R. Doc. 24, Ex. G.)

damages, Savarese states that he is entitled to maintenance and cure benefits.


## II.    SPOLIATION OF EVIDENCE

## A.    Legal Standard

The spoliation of evidence doctrine concerns the intentional destruction of evidence.[29]   If a party intentionally destroys evidence, the trial court may exercise its discretion to impose sanctions on the responsible party.[30]   The seriousness of the sanctions that a court may impose depends on the consideration of:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by other in the future.[31]

The sanctions may include exclusion of the spoiled evidence or an instruction to the jury to infer that the party spoiled the evidence because the evidence was unfavorable to that party's case.   Exclusion of spoiled evidence, however, is a "drastic

---

[29]    *Menges v. Cliffs Drilling Co.*, 2000 WL 765082, at *1 (E.D.La. June 12, 2000)(citing *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995); *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994)).

[30]    *Id.*

[31]    *Id.* (quoting *Schmid*, 13 F.3d 76, 78 (3d Cir. 1994)).

sanction" that courts generally try to avoid, especially when a lesser sanction would sufficiently even the playing field.[32] The preferred alternative is "the well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction."[33] This adverse inference rule "derives from the common sense notion that a party's destruction of evidence which it has reason to believe may be used against it in litigation suggests that the evidence was harmful to the party responsible for its destruction."[34] Accordingly, to restore the prejudiced party, an adverse inference "plac[es] the risk of an erroneous judgment on the party that wrongfully created the risk."[35]

Before a court may consider imposing sanctions, however,

---

[32] *Id.* at *2; see also *Tandycrafts, Inc. v. Bublitz*, No. 3:97-CV-1-74-T, 2002 WL 324390, at *3 (N.D.Tex. Feb. 27, 2002) (noting that summary judgment is an extreme remedy and should not be applied as a sanction for spoliation when a lesser sanction is available).

[33] *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). See, e.g., *Vodusek*, 71 F.3d at 155; *Schmid*, 13 F.3d at 78; *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993); *Nation-Wide Check Corp. v. Forest Hills Distribs.*, 692 F.2d 214, 217-18 (1st Cir. 1982); *In re Hopson Marine Transp., Inc.*, 168 F.R.D. 560, 567 (E.D.La. 1996).

[34] *Kronisch*, 150 F.3d at 126.

[35] *Id.* (quoting *Nation-Wide Check*, 692 F.2d at 218).

"the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed."[36]  Such a duty "arises when the party has notice that the evidence is relevant to litigation."[37]  Once a court concludes that a party was obliged to preserve the evidence, it must then consider whether the evidence was intentionally destroyed and the likely contents of that evidence.[38]  The Fifth Circuit requires the party who seeks sanctions to show that the party who allegedly spoiled the evidence acted in "bad faith."[39]  Negligence is not enough to support the imposition of sanctions for spoliation, "for it does not sustain an inference of consciousness of a weak case."[40]  Accordingly, a party seeking sanctions is not even entitled to an adverse inference unless that party can show that its adversary intentionally and in bad faith disposed of the evidence.

## B.  Analysis

Pearl River argues that Savarese intentionally spoliated

---

[36]   *Menges*, 2000 WL 765082, at *3.

[37]   *Id.*

[38]   *Id.*

[39]   *King v. Illinois Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003); see also *Anderson v. Prod. Mgmt. Corp.*, No. Civ.A. 98-2234, 2000 WL 492095, at *3 (E.D.La. Apr. 25, 2000) (collecting authorities).

[40]   *Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975).

evidence.[41]  Specifically, Pearl River argues that Savarese acted in "bad faith" by notifying Pearl River of his neck surgery only one day before the surgery occurred.[42]  As a result, Pearl River contends that it was unable to procure an independent medical examination (IME) of Savarese and consequently suffered irreparable harm.[43]  Pearl River seeks an adverse inference that Savarese's neck injury was not causally related to the accident aboard the M/V CHARLES K and, alternatively, a denial of Savarese's maintenance and cure benefits.[44]  Because the Court finds that Savarese did not intentionally spoliate evidence, neither an adverse inference nor a denial of Savarese's maintenance and cure benefits is warranted.

When Savarese agreed to undergo neck surgery, he arguably knew that the condition of his neck would be pertinent to this litigation.  Savarese did not undergo the surgery until May 2009, five months after he filed this suit.[45]  At the time, Savarese was represented by counsel and Savarese alleged injuries to his spine in his complaint.[46]  Thus, arguably Savarese had an

---

[41]  (R. Doc. 24.)

[42]  *Id.*

[43]  *Id.*

[44]  *Id.*

[45]  (R. Doc. 31, Ex. K.)

[46]  (R. Doc. 31, Ex. K; R. Doc. 1.)

obligation to preserve the evidence at issue--the condition of his neck--before undergoing surgery.

Even if Savarese had a duty to notify Pearl River of his neck surgery, however, breach of this duty does not amount to spoliation of evidence. Pearl River had ample opportunity to investigate Savarese's condition and to require an IME. Savarese notified Pearl River that he was going to have neck surgery on April 7, 2009, approximately six weeks before he actually did so.[47] Pearl River acknowledged this in its April 10, 2009 letter to Savarese's counsel.[48] Rather than request an IME before Savarese's neck surgery, however, Pearl River requested Savarese's medical records and an opportunity to depose Bartholomew and Savarese.[49] That Pearl River chose to conduct depositions and review Savarese's medical records in lieu of conducting an IME negates the notion that Savarese intentionally elected to have neck surgery to destroy evidence. The Court thus finds that there is insufficient evidence that Savarese acted in "bad faith."

Pearl River contends that the April 7 letter was too vague to provide adequate notice of Savarese's surgery because the letter did not indicate an exact date on which the surgery might

---

[47]   (R. Doc. 24, Ex. D.)

[48]   (R. Doc. 24, Ex. E.)

[49]   *Id.*

occur.[50]  This argument misses the point.  The appropriate

inquiry is whether Savarese acted in "bad faith."  That Savarese

gave Pearl River notice of his upcoming surgery strongly suggests

that he did not.  Savarese's letter indicates that Savarese will

undergo surgery, the specific type of surgical procedure he will

undergo, and that he "would be happy to cooperate if [Pearl

River] desires any presurgery evaluation."[51]  This is ample

information to place Pearl River on notice that it should

coordinate with Savarese if it wants to conduct a pre-surgery

IME.  Indeed, Pearl River's own April 10 letter confirms that it

is aware of Savarese's pending surgery, the exact procedure

Savarese will undergo, and that Savarese is amenable to a pre-

surgery evaluation.[52]  The April 10 letter goes on to state that

"Pearl River is unable to determine what type of evaluation would

be required to respond to this development."  As a result, any

irreparable harm Pearl River may suffer from the lack of an IME

before Savarese's surgery is not the result of Savarese's "bad

faith," but rather Pearl River's own choice not to schedule an

IME.  A contrary conclusion would suggest that Savarese should

have waited to undergo surgery until Pearl River could

---

[50]    (R. Doc. 46.)

[51]    (R. Doc. 24, Ex. D.)

[52]    (R. Doc. 24, Ex. E.)

"determine" what type of evaluation was necessary "to respond."[53]
In addition, any harm Pearl River may suffer is mitigated by the
availability of other evidence.  For example, Pearl River may
still challenge the causal link between Savarese's neck injury
and the accident aboard the M/V CHARLES K using Savarese's pre-
surgery medical records or deposition testimony from Shamsnia,
Bartholomew, or Savarese--the very evidence Pearl River requested
in its April 10 letter.[54]

Moreover, an adverse inference serves both evidentiary and
punitive purposes.[55]  In this case, however, an adverse inference
would serve neither.  First, the evidentiary purpose of an
adverse inference stems from "nothing more than the common sense
observation that a party who has notice that a document is
relevant to litigation and who proceeds to destroy the document
is more likely to have been threatened by the document than is a
party in the same position who does not destroy the document."[56]
No common sense observation is possible here without suggesting
that Savarese underwent neck surgery to bolster his chances for
success on his damage claim in this lawsuit.  A more pragmatic

---

[53]     *Id.*

[54]     *Id.*

[55]     *Nation-Wide Check Corp. v. Forest Hills Distributors*,
692 F.2d 214, 218 (1st Cir. 1982)(Breyer, J.)

[56]      *Nation-Wide Check Corp*, 692 F.2d at 218; *Akiona v.
United States*, 938 F.2d 158, 161 (9th Cir. 1991).

conclusion is that Savarese had the surgery to alleviate pain or discomfort in his neck.  Regardless of Savarese's true motivation, Pearl River had an opportunity to conduct an IME before Savarese's surgery, and chose not to do so.  This negates any suggestion that Savarese "was more likely to have been threatened" by his neck condition than a party who chose not to undergo the surgery in similar circumstances.[57]  Second, an adverse inference also serves a punitive purpose.  By shifting the risk of error to the party that wrongfully created the risk, an adverse inference deters a party from destroying relevant evidence before its introduction at trial.[58]  The deterrence rationale is not very compelling in this case, however, as the choice to undergo surgery is quite different than the choice to destroy written documents once on notice of the documents' relevance in a judicial proceeding.[59]  The risks, discomfort and inconvenience of surgery provide a deterrent to undergoing it absent medical need.  Further, Pearl River has not cited a single case that supports its position that the spoliation doctrine applies on these facts.  In any event, Savarese's April 7 letter

---

[57]     *See id.*

[58]     *Nation-Wide Check Corp*, 692 F.2d at 218.

[59]     *See e.g., King*, 337 F.3d at 556 (destruction of maintenance records of allegedly malfunctioning signal); *U.S. v. Wise*, 221 F.3d at 156 (deletion of computer files); *Ford v. Potter*, 354 Fed. App'x. 28, *33 (5th Cir. 2009)(misplaced interview notes).

and the opportunity provided Pearl River to conduct an IME before
Savarese's surgery suggest that the rule accomplished its
deterrent effect.

Pearl River relies on four district court cases in support
of its argument.[60] Yet, each is distinguishable in some respect,
and none supports the application of the spoliation doctrine to
this set of facts. Pearl River first argues that the case
*Proshee v. Tidewater marine, Inc.* supports its argument.[61] In
*Proshee*, the Court sanctioned a plaintiff's attorney because his
client did not appear at an IME arranged by the defendant.[62] In
so doing, the *Proshee* Court did not address the spoliation
doctrine, or any sanctions thereunder.[63] Instead, the *Proshee*
Court sanctioned the plaintiff's attorney under the Court's
inherent power to "punish conduct which abuses the judicial
process."[64] *Proshee* thus says nothing in support of Pearl River's

---

[60]     (R. Doc. 24.)(citing *Menges v. Cliff's Drilling*, No.
99-2159, 2000 WL 765082 (E.D.La. June 12, 2000); *Proshee v.
Tidewater marine, Inc.*, 927 F.Supp. 959, 961 (E.D.La. June 18,
1996)(Porteus, J.); *Rebardi v. Central Boat Rentals, Inc.*, No.
03-1776, 2007 WL 2993867 (W.D.La. Oct. 11, 2007); *Clark v. E.I.
DuPont de Nemours and Co.*, No. 97C-12-048-PLA, 2001 WL 1482831,
(Del. Super. 2001).

[61]     (R. Doc. 24.)

[62]     *Proshee*, 927 F.Supp. at 961.

[63]     *Id.*

[64]     *Id.* at 961 (quoting *Chambers v. NASCO, Inc.*, 501 U.S.
32 (1991)).

14

argument that the spoliation doctrine required Savarese to forego neck surgery until Pearl River conducted an IME.  Moreover, *Proshee* is factually distinguishable.  Unlike the plaintiff in *Proshee*, Savarese did not fail to appear at a scheduled IME. Pearl River elected not to conduct an IME before Savarese's surgery.[65]

The case of *Rebardi v. Central Boat Rentals, Inc.* also involved the failure of a plaintiff to appear at a scheduled IME.[66]  The defendant in *Rebardi* requested a spoliation instruction, but the Court deferred its decision on whether such was appropriate because the existing factual record did not clearly show whether the plaintiff's failure to appear at the scheduled IME was intentional, and therefore in "bad faith," or merely negligent.[67]  *Rebardi* therefore stands for the well-settled principle that a spoliation instruction is permissible only in cases of "bad faith."  In addition, the *Rebardi* Court's decision to defer undermines Pearl Rivers suggestion that Savarese's election to undergo surgery amounted to "bad faith."  If this were true, the factual record in *Rebardi* would have been sufficient for the Court to make a final determination.  The *Rebardi* Court notes that Rebardi had undergone surgery before its

---

[65]     (R. Doc. 24, Ex. E.)

[66]     *Rebardi*, 2007 WL 2993867.

[67]     *Id.*

15

decision to defer.[68]

Lastly, the Court finds the case of *Clark v. E.I. DuPont de Nemours and Co.* equally distinguishable.[69]  In *Clark*, a Delaware Superior Court dismissed a plaintiff's claim as a sanction under Federal Rule of Civil Procedure 11 after the plaintiff opportunely scheduled hip replacement surgery a week before trial, without notice, and without an opportunity for the defendant to conduct an IME.[70]  The Court found that given the plaintiff's decision, no sanction short of dismissal could offset the prejudice incurred by the defendant.[71]  As the court noted, the *Clark* plaintiff's decision "precluded the defendants from adequately preparing any defense to his claims that are now several times higher than they were before the surgery."  Like *Poshee*, however, *Clark* does not address the spoliation doctrine and therefore does little to bolster Pearl River's argument.[72]  Moreover, the present case does not entail a last-minute surprise by Savarese.  As previously discussed, Pearl River had ample opportunity to conduct an IME in this case, and chose to conduct depositions and review Savarese's medical records instead.  For

---

[68]  *Id.*

[69]  *Clark*, 2001 WL 1482831.

[70]  *Id.*

[71]  *Id.*

[72]  *Id.*

all of the foregoing reasons, the spoliation doctrine has no
application here.

### III. MAINTENANCE AND CURE

### A.    Legal Standard

Pearl River also moves for a judgment that it does not owe
Savarese further maintenance and cure.[73]  The Court construes
this as a motion for partial summary judgment on Savarese's
maintenance and cure claim.

Under the Federal Rules of Civil Procedure, summary judgment
is appropriate when "the pleadings, the discovery and disclosure
materials on file, and any affidavits show that there is no
genuine issue as to any material fact and that the movant is
entitled to judgment as a matter of law."[74]  When assessing
whether a dispute as to any material fact exists, the Court
considers "all of the evidence in the record but refrains from
making credibility determinations or weighing the evidence."[75]
All reasonable inferences are drawn in favor of the nonmoving
party, but "unsupported allegations or affidavits setting forth

---

[73]    *Id.*

[74]    Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477
U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d
1069, 1075 (5th Cir. 1994).

[75]    *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.
Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[76]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[77]  The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[78]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[79]  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue

---

[76]    *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[77]    *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991).

[78]    *Id.* at 1265.

[79]    *See Celotex*, 477 U.S. at 325.

exists.[80]  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.[81]

## B.    The Seaman's Maintenance and Cure Obligations

The maritime employer's duty of maintenance and cure, which dates at least to the medieval sea codes[82], obligates him to pay for the lost wages, medical care, food, lodging, and other incidental expenses of a seaman who falls ill or is injured while in the service of the vessel.[83]  The duty is practically absolute.  Unlike an employer's duties under the Jones Act, for example, liability for maintenance and cure is "in no sense ... predicated on the fault or negligence of the shipowner."[84]  Because the duty is so broad, maintenance and cure has at times been compared to mandatory employer-provided health and accident insurance.[85]

_____

[80]     *See id.* at 324.

[81]     *See, e.g.*, *id.* at 325; *Little*, 37 F.3d at 1075; *Isquith for and on Behalf of Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

[82]     *See The Osceola*, 189 U.S. 158 (1903); *Harden v. Gordon*, 11 F.Cas. 480, 482-83 (C.C.D.Me. 1823).

[83]     *See Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 730 (1943); *The Osceola*, 189 U.S. at 175.

[84]     *Aguilar*, 318 U.S. at 730.

[85]     *See Lindquist v. Dilkes*, 127 F.2d 21, 23-24 (3d Cir. 1942); Gilmore & Black, The Law of Admiralty 281-82 (2d ed. 1975).

In keeping with the absolute nature of the right, a
plaintiff's burden of proof on a maintenance and cure claim is
slight: he need only establish that he was injured or became ill
while "subject to the call of duty as a seaman."[86]  There are
defenses to a claim for maintenance and cure, but, as the Fifth
Circuit has noted, they "are few and narrowly applied."[87]  First,
it has long been the rule that a seaman who causes his own injury
through "some wilful misbehavior or deliberate act of
indiscretion" will not be entitled to receive maintenance and
cure.[88]  As the Supreme Court has emphasized time and again,
however, the seaman's behavior must be "positively vicious"
before he will be denied maintenance and cure.[89]  "[N]egligence
or contributory negligence of even the grossest kind will not
itself qualify as misconduct and forfeit the right."[90]

_____

[86]    *Aguilar*, 318 U.S. at 732.  *see also* 1 Schoenbaum,
Admiralty and Maritime Law § 6-28; Fifth Circuit Pattern Jury
Instructions: Civil § 4.11 (2006 ed.).

[87]    *Silmon v. Can Do II, Inc.*, 89 F.3d 240, 242 (5th Cir.
1996).

[88]    *Aguilar*, 318 U.S. at 731; *see also* Rules of Oleron,
art. 6, reprinted in 2 The Black Book of the Admiralty 217 (Sir
Travers Twiss ed. & trans., London, Longman & Co. 1873); Abbott
on Shipping 258-59 (J.C. Perkins ed., Boston, Little & Brown
1846).

[89]    *Warren v. United States*, 340 U.S. 523, 528 (1951).

[90]    Gilmore & Black, supra, at 291; see also *Farrell v.*
*United States*, 336 U.S. 511, 517 (1949)(holding that seaman whose

After receiving a claim for maintenance and cure, a shipowner may investigate and require corroboration of the claim before commencing payments.[91]  If the shipowner unreasonably rejects the claim after investigating it, he is liable not only for maintenance and cure benefits, but also for compensatory damages.[92]  If the shipowner's rejection of a maintenance and cure claim is arbitrary and capricious, punitive damages may result.[93]

The right to maintenance and cure also entails certain obligations by the seaman.  A seaman must act with reasonable diligence "to ascertain the nature of his illness and his need for treatment, and he must seek the necessary treatment to correct the illness or injury."[94]  These obligations derive from

---

injury was "due to no negligence but his own" was nevertheless "entitled to the usual measure of maintenance and cure at the ship's expense"); *Aguilar*, 318 U.S. at 731 ("Conceptions of contributory negligence, the fellow-servant doctrine, and assumption of risk have no place in the liability or defense against [a claim for maintenance and cure].  Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection.").

[91]    *See Harrison v. Diamond Offshore Drilling, Inc.*, No. 07-471, 2008 WL 708076, *23 (E.D.La. 2008).

[92]    *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 374 n. 3 (5th Cir. 1981).

[93]    *McWilliams v. Texaco, Inc.*, 781 F.2d 514, 519 (5th Cir. 1986)

[94]    *Lipari v. Maritime Overseas Corp.*, 493 F.2d 207 (3d Cir. 1974).

the seaman's duty to mitigate damages and keep the cost of maintenance and cure to a minimum.[95]  Thus, a seaman has been denied his right to maintenance and cure when he voluntarily rejects free hospital care and consults a private physician[96], or if the seaman "quit[s] participation in a course of therapy already begun."[97]  However, a seaman may engage the services of his own physician.

## C.  Analysis

Pearl River argues that implicit in the shipowner's right to investigate the claim is the seaman's obligation to inform the shipowner of the medical treatment he receives.[98]  Pearl River contends that Savarese breached this implicit obligation by failing to give Pearl River advance notice of his neck surgery.[99]  Thus, Pearl River moves for a judgment that it does not owe any

---

[95]  *See Wiseman v. Sinclair Refining Co.*, 290 F.2d 818, 820 (2d Cir. 1961); *Dowdle v. Offshore Exp., Inc.*, 809 F.2d 259, 264-65 (5th Cir. 1987)(citing *Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1133 (5th Cir. 1981) and *Sanford Bros. Boats, Inc. v. Vidrine*, 412 F.2d 958, 974 (5th Cir. 1969)).

[96]  *See Dowdle*, 809 F.2d at 265; *see also Pelotto v. L & N Towing Co.*, 604 F.2d 396, 402-04 (5th Cir. 1979)(forfeiture of right may be limited to right to cure only).

[97]  *Oswalt v. Williamson Towing Co., Inc.*, 488 F.2d 51, 53-54 (5th Cir. 1974).

[98]  (R. Doc. 24.)

[99]  *Id.*

further maintenance and cure to Savarese.[100]

Pearl River cites to no case, and the Court has found none, suggesting that reimbursement liability for maintenance and cure cannot attach until the seaman gives notice of the specific treatments he is receiving.[101]  Furthermore, the record undermines Pearl River's argument that it did not have enough information to investigate Savarese's maintenance and cure claim before his neck surgery.  First, Hontas's March 6, 2009 letter to Pearl River notes that Savarese is seeing Shamsnia and that Savarese could return to work after Shamsnia reevaluates him.[102]  At a minimum, this letter, in conjunction with Savarese's January 15, 2009 complaint, provided notice that Savarese's alleged injuries included more than the knee injury Hontas was treating.  Next, on April 7, 2009, Savarese notified Pearl River that he was going to have neck surgery and Pearl River acknowledged this fact in its April 10 response.[103]  Savarese's surgery did not occur until six weeks later.[104]  The Court thus finds that Savarese provided Pearl

---

[100]     *Id.*

[101]     *See Charpentier v. Blue Streak Offshore, Inc.*, No. 96-323, 1997 WL 426093 (E.D.La. 1997)(noting that a shipowner's right to investigate and require corroboration of a maintenance and cure claim is limited to the question of whether the seaman was in the service of the ship at the time his injury occurred).

[102]     (R. Doc. 31, Ex. G.)

[103]     (R. Doc. 31, Ex. H; R. Doc. 31, Ex. I.)

[104]     (R. Doc. 31, Ex. L.)

River sufficient notice to do an IME and did not impede Pearl River's right to investigate his maintenance and cure claim. Accordingly, Pearl River's motion for partial summary judgment is DENIED.

## IV.  CONCLUSION

For the foregoing reasons, the Court DENIES Pearl River's motion for an adverse inference.[105]

It is so ordered.

New Orleans, Louisiana, this 30th day of April, 2010.

_Sarah Vance_
_____
SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

---

[105]  (R. Doc. 24.)