UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JASON SAVARESE                              CIVIL ACTION

VERSUS                                      NO: 09-129

PEARL RIVER NAVIGATION, LLC                 SECTION: R(5))

## ORDER AND REASONS

From August 2-3, 2010, the Court conducted a bench trial in
this maritime personal injury action.  After considering all of
the evidence presented at trial, the Court finds that Savarese
has received the full amount of maintenance and cure to which he
is entitled, and that Pearl River is not liable for damages
because Savarese has failed to prove that Pearl River's
negligence or the unseaworthy condition of the vessel caused his
injuries.  The Court makes the following findings of fact and
conclusions of law.  To the extent a conclusion of law
constitutes a finding of fact, the Court adopts it as such.

**I.     FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**A.     Procedural and Factual Background**

   1.   <u>Savarese's Pre-employment Representations</u>

   Savarese was hired as a deck hand by Pearl River through the St. Tammany Parish jail work release program on April 1, 2008.[1] Saverese previously had been sentenced to probation on felony convictions,[2] and his parole was revoked on November 17, 2005 after testing positive for drugs.[3]  In connection with the work release program, Savarese completed a pre-employment medical evaluation at Pelican Urgent Care on March 21, 2008.[4]  Savarese indicated on the evaluation form that he did not have and never did have back trouble or a neck, head, or spinal injury.[5] Savarese also indicated that he had never been limited or restricted for health reasons, never had a back injury, and had never been in the hospital.[6]  Deborah Warriner, Pearl River's former secretary-treasurer and current office manager, testified that Pearl River reviewed and relied on Savarese's representations in deciding to hire him and in determining his

---

   [1]    (Trial Tr. (Day I) at 78, 145-47; Pl.'s Ex. 2.)

   [2]    (Def.'s Ex. 45.)

   [3]    (Trial Tr. (Day I) at 147, 175-76; Def.'s Ex. 45.)

   [4]    (Trial Tr. (Day I) at 229-30; Pl.'s Ex. 2.)

   [5]    (Trial Tr. (Day I) at 229-30; Pl.'s Ex. 2.)

   [6]    (Trial Tr. (Day I) at 229-30; Pl.'s Ex. 2.)

physical condition to perform the demanding manual labor involved in working as a deck hand.[7]  She also testified that, had Savarese disclosed a history of neck and back injuries, Pearl River would have requested medical records verifying the circumstances of the earlier injuries and asked for reliances from doctors allowing Savarese to work without limitations before it would have hired him.[8]  An X-ray report attached to Savarese's medical disclosures revealed a limbus body at level L4 of his lumbar spine,[9] but Warriner stated that she did not investigate it because it appeared to be "just a spot" in light of Savarese's statements that he had not had past neck and back injuries.[10]

As it turns out, Savarese has suffered a number of neck and back injuries in the past.  Savarese went to the emergency room on September 12, 1996 for a whiplash injury in connection with a garbage truck rollover accident.[11]  He was diagnosed with acute cervical strain.[12]  Savarese went to the emergency room again on July 17, 1999 for low back pain and numbness in connection with a

---

[7]     (Trial Tr. (Day I) at 79-80, 98-100.)

[8]     (*Id.* at 100-01.)

[9]     (Pl.'s Ex. 2.)

[10]    (Trial Tr. (Day I) at 101.)

[11]    (*Id.* at 167-68; Def.'s Ex. 35.)

[12]    (Def.'s Ex. 35.)

bush hogging incident.[13]  He was diagnosed with "lumbar strain,"[14] and an X-ray revealed "a triangular bony fragment separated from the anterior superior corner of L4 compatible with an unfused apophysis."[15]  On November 29, 2000, Savarese was diagnosed with sciatica after complaining of a "knot" in his low back and pain radiating down his leg.[16]  Savarese again went to the emergency room on June 16, 2001 for neck pain in connection with a car accident,[17] and yet again on January 14, 2002 for neck pain in connection with another car accident.[18]  Savarese was diagnosed with neck strain on January 14, 2002.[19]  On February 25, 2003, Savarese went to the emergency room complaining of low back pain for two days with pain radiating through his buttocks.[20]  An X-ray revealed "fragmentation along the anterior-superior border of L4 which is felt to be the so-called limbus vertebral body."[21] On August 26, 2003, Savarese went to the emergency room

---

[13]    (Trial Tr. (Day I) at 191, 222; Def's Ex. 35.)

[14]    (Def.'s Ex. 35.)

[15]    (*Id.*)

[16]    (Trial Tr. (Day I) at 222-23; Def.'s Ex. 35.)

[17]    (Trial Tr. (Day I) at 169, 223; Def.'s Ex. 35.)

[18]    (Trial Tr. (Day I) at 170; Def.'s Ex. 35.)

[19]    (Def.'s Ex. 35.)

[20]    (*Id.*)

[21]    (*Id.*)

complaining that "my sciatic nerve is killing me," and "I can't sit down."[22] Savarese was diagnosed with sciatica.[23] Finally, on July 21, 2004, Savarese visited Lakeview Regional Medical Center and complained that he was "unable to move his neck back to its normal position."[24] At trial, Savarese testified that he exaggerated these past injuries because he was addicted to prescription pain medication and was trying to obtain more medication.[25] Savarese stated in his deposition, however, that if he told a doctor that he had a problem in the past, he really did have that problem.[26]

### 2. The Incident On November 16, 2008

On November 16, 2008, a crane at the stern of the TLC 15 was used to lift a wrecked barge from a river.[27] The wrecked barge and the 120-foot crane boom were each astern of the TLC when a shackle tore, causing the boom to release, rise aloft, arc and crash toward the bow.[28] The parties agree that the crane was

---

[22]    (Trial Tr. (Day I) at 220; Def.'s Ex. 35.)

[23]    (Def.'s Ex. 35.)

[24]    (Trial Tr. (Day I) at 215; Def.'s Ex. 48.)

[25]    (Trial Tr. (Day I) at 171, 174.)

[26]    (Def.'s Ex. 5 at 83.)

[27]    (Trial Tr. (Day I) at 10, 13, 48.)

[28]    (*Id.* at 13, 18, 20, 48.)

owned and operated by Pearl River, and that Pearl River is legally responsible for its failure.[29]  They also agree that Savarese was without fault for the crane's failure.[30]  They do not agree that Savarese was injured as a result of the crane's failure.

At the time of the November 16, 2008 crane incident, Savarese was preparing food in the galley at the bow of the vessel.[31]  Bryan Williams, a crew member, was alone in the crane cab.[32]  Lance Poche, a barge superintendant and crane operator,[33] was standing with Jeffrey Dark, a work release crew member,[34] approximately 10 to 12 feet from Williams.[35]

All of the relevant witnesses agree that when the crane boom crashed, it did not hit Savarese or the crew quarters.[36] Instead, the crane boom landed 10 to 15 feet away from the crew

---

[29]    (*Id.* at 2.)

[30]    (*Id.*)

[31]    (*Id.* at 14, 152.)

[32]    (*Id.* at 11, 17-19; Pl.'s Ex. 15.)

[33]    (*Id.* at 47.)

[34]    (*Id.* at 17, 50, 52; Pl.'s Ex. 15.)

[35]    (*Id.* at 19; Dark Dep. Tr. at 9.)

[36]    (Trial Tr. (Day I) at 26-28, 34, 48-49, 57, 71; Dark Dep. Tr. at 15-19, 44, 55.)

quarters.[37]  A photograph taken shortly after the accident
indicates that the crane boom came to rest on top of a generator,
with its extremity continuing off the bow and into the water.[38]
Both Williams and Poche testified that the TLC did not rock when
the crane boom fell.[39]  Williams explained that there were
"spud[s] spudded down into the ground."[40]  More specifically,
there were two hydraulic spuds, one on either side of the vessel,
that went "into the ground to make the barge stay in a certain
spot."[41]  The spuds were approximately 18 inches square, four to
five feet long, and descended approximately 20-30 feet into the
mud below.[42]  At trial, Saverese testified that the TLC was in
shallow water and was actually sitting on bottom.[43]  Poche has
unrelated injuries that cause him to walk with a limp, and he did
not lose his footing at any time during the incident.[44]  For his

---

[37]    (Trial Tr. (Day I) at 34, 48-49, 71; Dark Dep. Tr. at
44, 55; Pl.'s Ex. 1a.)

[38]    (Pl.'s Ex. 1c.)

[39]    (Trial Tr. (Day I) at 20-21, 43-44, 64.)

[40]    (*Id.* at 21.)

[41]    (*Id.* at 36-37.)

[42]    (*Id.*)

[43]    (*Id.* at 201.)

[44]    (*Id.* at 72; Dark Dep. Tr. at 26-27.)

part, Dark asserts that the TLC rocked when the crane cable gave way.[45]  No evidence was submitted about the weight of the crane.

Some time after the crash,[46] Williams, Poche, and Dark congregated by a yellow toolbox close to the crew quarters.[47] Williams testified that he saw Savarese "right in front" of the galley door limping toward the toolbox.[48]  When Savarese arrived, Williams observed an injury to Savarese's knee.[49]  Williams reported that Savarese said he saw "the crane falling or something and he jumped out the way and he fell on the ground." Savarese told Williams that he hurt his leg when he jumped out the way.[50]  Williams testified that over the next hour and 45 minutes, Savarese complained only about his knee and did not report trauma to his head, loss of consciousness, neck pain, back pain, or being doused with diesel fuel.[51]  Williams also did not

---

[45]    (Dark Dep. Tr. at 13.)

[46]    (Trial Tr. (Day I) at 22, 25, 58; Dark Dep. Tr. at 57-59.)

[47]    (Trial Tr. (Day I) at 25; Pl.'s Ex. 1j.)

[48]    (Trial Tr. (Day I) at 22, 35; Pl.'s Ex. 1e.)

[49]    (Trial Tr. (Day I) at 25-26, 28.)

[50]    (*Id.* at 27.)

[51]    (*Id.* at 38-39, 45.)

smell diesel fuel on Savarese,[52] although he acknowledged that there was fuel on the deck after the accident.[53]

Poche confirms this sequence of events. Poche testified that, a few minutes after the accident, he was with Williams and Dark at the yellow toolbox when he observed Savarese at the galley door walking to meet them.[54] Poche observed an injury to Savarese's leg and heard Savarese state that "when he heard a crash he ran out the galley and he seen the boom falling and he ran around the corner and dove between the living quarters and the water tank."[55] Poche testified that, over the next hour and 30 minutes, Savarese complained only about his knee and never reported trauma to his head, loss of consciousness, neck injuries, back injuries, or being doused with diesel fuel.[56] Poche did not smell diesel fuel on Savarese.[57]

Savarese tells a different story. Savarese testified that he was cooking in the galley when he heard a terrible noise.[58] He states that he went outside, saw the crane boom falling toward

---

[52] (*Id.* at 38.)

[53] (*Id.* at 45.)

[54] (*Id.* at 58-60, 72.)

[55] (*Id.* at 60-62, 70.)

[56] (*Id.* at 73-74.)

[57] (*Id.*)

[58] (*Id.* at 153.)

9

the galley, and began to run.[59]  Savarese states that he tripped

on the galley step and:

> fell flat on my face by taking the left out of the galley.
> As I hit the ground right there, the boom it [hit], and the
> barge rocked some and I came back up and hit my knees.  I
> had landed on my stomach, but I was all the way back up to
> on all fours trying to scramble, but the barge rocked some
> and it came up and hit me in my knees which I didn't kind of
> feel at the moment.[60]

Savarese said that the barge bounced him like a trampoline

and that "I'm not going to say came up off the ground high, but

it rocked enough to make the barge come up and hit the bottom of

my knees and the palms of my hands which I continued to run on

all fours."[61]  Savarese asserts that he got to his feet and ran

between the water tank and the rear wall of the crew quarters,

continued along the port wall, and finally met Williams, Poche,

and Dark at the yellow toolbox.[62]  Savarese noticed that he had a

cut on his right knee when he arrived at the toolbox.[63]  Savarese

testified that he did not remember losing consciousness or

hitting his head during the accident.[64]

---

[59]    (*Id.*)

[60]    (*Id.*)

[61]    (*Id.* at 156, 201.)

[62]    (*Id.*)

[63]    (*Id.* at 158.)

[64]    (*Id.* at 206.)

Dark testified that, as the crane boom was falling toward the bow, Savarese jumped out of the galley door and "ran, skipped, you know, he started moving sporadically, moving, you know, to get out of the way. And I seen him run between the living quarters and the water tank."[65] Dark saw Savarese begin to run before the crane boom actually crashed, and Dark did not see Savarese fall or crawl; Dark saw Savarese "running upright."[66] Dark asserts that he saw Savarese again 10 to 12 seconds later by the yellow toolbox.[67] Dark testified that whatever happened to Savarese happened during the time it took him to circle the crew quarters.[68] At the toolbox, Dark observed a cut on Savarese's knee.[69] Dark heard Savarese say that "he fell with a pickle jar. He was getting pickles out and he had that in his hand. He said he fell with that."[70] Dark did not hear Savarese complain about hitting his head.[71] Dark also did not see diesel fuel on Savarese,[72] although Dark acknowledged

---

[65]   (Dark Dep. Tr. at 16, 57.)

[66]   (*Id.* at 17, 33.)

[67]   (*Id.* at 18-20.)

[68]   (*Id.* at 28-29.)

[69]   (*Id.* at 20, 31.)

[70]   (*Id.* at 21.)

[71]   (*Id.* at 35.)

[72]   (*Id.* at 64.)

that fuel had puddled in one spot on the deck.[73]  Like Savarase,
Dark was hired by Pearl River through the St. Tammany Parish work
release program.[74]

### 3. Visits To Physicians

Shortly after the accident, Savarese was taken to Pelican
Urgent Care complaining of pain to his low back, right hip, right
knee, and left shin.[75]  Contemporaneous notes reflect that
Savarese reported being "thrown against [the] cabin."[76]
Savarese received an X-ray of his lumbar spine on November 17,
2008.  The X-ray revealed "no acute fractures" and "an old
fracture involving the anterior superior corner of the body of
L4."[77]  The X-ray also revealed "normal radiographs" of both
knees.[78]  The old fracture was "possibly from adolescence."[79]

On November 19, 2008, Savarese visited Dr. Mark Hontas, his
personal physician.[80]  Savarese complained of right hip, right

---

[73]    (*Id.* at 55-56.)

[74]    (*Id.* at 7.)

[75]    (Trial Tr. (Day I) at 104-05, 159; Def.'s Ex. 31.)

[76]    (Def.'s Ex. 31.)

[77]    (*Id.*)

[78]    (*Id.*)

[79]    (*Id.*)

[80]    (Trial Tr. (Day II) at 2.)

knee, right foot and low back pain,[81] but did not complain of cervical pain.[82]  Savarese told Hontas that the crane boom caused him to hit the water cooler and the living quarters.[83] Savarese later told his physical therapist on December 1, 2008 that "he had to jump out of the way from part of the crane falling and . . . that he was bounced on the platform as a load fell onto the platform."[84]

Hontas diagnosed a contusion to Savarese's right hip and right knee and prescribed non-narcotic pain medication.[85]  Hontas believed that Savarese's hip pain was caused by a contusion and not a herniated disc in his back.[86]  Surgery was performed on Savarese's knee on January 20, 2009 and revealed a surface fissure where the femur meets the kneecap.[87]  Savarese recovered progressively through January and early February but complained of pain and popping in his knee on February 10, 2009.  Although Hontas did not observe swelling or popping, nor any objective difference from Saverese's last visit on February 4, 2009, Hontas

---

[81]  (*Id.* at 3, 19.)

[82]  (*Id.* at 30.)

[83]  (*Id.* at 21; *see also* Def.'s Ex. 22 at 939.)

[84]  (Def.'s Ex. 23 at 392.)

[85]  (Trial Tr. (Day II) at 5.)

[86]  (*Id.* at 29.)

[87]  (*Id.* at 11-12.)

prescribed Percocet as a pain reliever.[88]  Hontas cancelled the

prescription on or about February 19, 2009, however, after

learning that Savarese was attempting to refill the

prescription.[89]  On March 6, 2009, Savarese informed Hontas that

he was seeing Dr. Morteza Shamsnia but did not state why.[90]

Hontas testified that Savarese's knee did not prevent him from

working as of March 6, 2009, and that Savarese's knee reached

maximum medical improvement on June 1, 2009.[91]

Meanwhile, on December 6, 2008, Savarese was referred by his

attorneys to Shamsnia.[92]  Savarese reported to Shamsnia that "he

was pushed against the wall and sustained trauma to the right

side of his body, including his head."[93]  Savarese said he

"apparently lost his consciousness."[94]  Savarese also complained

of pain in his neck for the first time.[95]  Shamsnia ordered tests

on Savarese's neck and back, which were conducted in January and

---

[88]    (*Id.* at 14, 23.)

[89]    (*Id.* at 24-25, 32.)

[90]    (*Id.* at 15, 25, 27.)

[91]    (*Id.* at 15, 25-26.)

[92]    (Trial Tr. (Day I) at 162; Shamsnia Dep. Tr. at 27.)

[93]    (Def.'s Ex. 24 at 522.)

[94]    (*Id.*)

[95]    (*Id.*)

February 2008.[96]  Shamsnia testified that Savarese's test results
were "significant" and causally related to the accident in
November 2008.[97]  Shamsnia also testified, however, that his
conclusion of causation was "based on what [Savarese] told me,"[98]
and "[i]f this is inaccurate, the conclusion is not exactly what
it should be."[99]  Shamsnia acknowledged that it was important for
him to have an accurate patient history in order to form an
accurate opinion on medical causation, but that Savarese never
told him about his past neck and back problems.[100]  Shamsnia also
acknowledged that he never reviewed Savarese's medical records
from other treating physicians.[101]  When confronted with
Savarese's full medical history, Shamsnia stated that Savarese
had "probably a chronic back condition exacerbated by the
trauma."[102]  Shamsnia further testified that "falling down,
tripping forward, falling on [one's] hands and knees" would *not*
"jar the cervical spine and result in a ruptured disc."[103]

---

[96]    (Shamsnia Dep. Tr. at 10-14.)

[97]    (*Id.* at 10, 21, 25.)

[98]    (*Id.* at 21.)

[99]    (*Id.* at 58.)

[100]   (*Id.* at 26, 29.)

[101]   (*Id.* at 28-29, 32-33.)

[102]   (*Id.* at 23-24, 26.)

[103]   (*Id.* at 59.)

Between January 31 and August 12, 2009, Shamsnia prescribed Savarese a three-month supply of Lortab on January 31, 2009; renewed the three-month prescription twice on March 18 and April 22, 2009; prescribed a three-month supply of Vicodin on June 17, 2009; prescribed a one-month supply of Percocet on July 1, 2009; and renewed the Percocet prescription in early August.[104] Separately, Dr. J. Kevin Jackson, Shamsnia's associate, prescribed Savarese a four-month supply of Lortab on April 1, 2009 after Savarese asserted that his medication was stolen.[105] Savarese told Jackson that the crane bounced him "up in the air," "sprayed him with diesel fuel," and "broke both of his knees."[106] Between Hontas, Shamsnia, and, later, Dr. Bradley Bartholomew, Savarese received prescriptions for approximately sixteen months of pain medication over a seven-month period. Shamsnia thought it was "fair to say this patient probably has drug-seeking behavior and he did get it."[107]

Savarese's attorneys made arrangements for Savarese to see Bartholomew on March 12, 2009.[108] The same day, Bartholomew

---

[104]    (*Id.* at 40-45.)

[105]    (*Id.* at 47-48.)

[106]    (Def.'s Ex. 24 at 542.)

[107]    (Shamsnia Dep. Tr. at 53.)

[108]    (Bartholomew Dep. Tr. at 56-57.)

reviewed Savarese's test results and recommended neck surgery.[109]

Bartholomew testified that he thought Savarese's fall in November

2008 caused a ruptured disc at his C5-6 level.[110] Bartholomew's

conclusion was based on the history related to him by Savarese

and on the assumption that Savarese did not have "ongoing neck

pain" before the accident.[111] Bartholomew acknowledged that it

was important for him to have an accurate patient history in

order to form an accurate opinion on medical causation, but that

he did not have a "completely accurate" history for Savarese.[112]

Indeed, Bartholomew was not aware until the day before he

testified that Savarese had *any* history of neck and back pain.[113]

Bartholomew was unable to causally relate Savarese's back

injuries to the crane accident in November 2008.[114] Savarese

received artificial disc replacement surgery at the C5-6 level on

May 20, 2009.[115] Bartholomew prescribed Savarese 45 tablets of

Percocet after his surgery.[116]

---

[109]  (*Id.* at 11.)

[110]  (*Id.* at 9, 17-19.)

[111]  (*Id.* at 19.)

[112]  (*Id.* 69, 73-74.)

[113]  (*Id.* at 37-39.)

[114]  (*Id.* at 39-40, 47, 56, 75-76, 85.)

[115]  (*Id.* at 14.)

[116]  (*Id.* at 41.)

It is not disputed that Pearl River paid Savarese maintenance and cure for his knee injury at a daily rate of $31.50 from November 2008 through mid-July 2009.[117]  Pearl River also paid approximately $15,000 in medical bills associated with Savarese's knee treatment.[118]  Pearl River did not, however, pay maintenance and cure for Savarese's alleged neck and back injuries.[119]  Pearl River began investigating Savarese's claims for maintenance and cure in March 2009 after receiving bills for prescription medication unrelated to Hontas's treatment.[120] Warriner testified that she was not aware at the time that Savarese was consulting the doctors (Shamsnia and Bartholomew) who prescribed the medication.[121]

**B.  Maintenance and Cure**

1.  <u>Applicable Law</u>

The duty of maintenance and cure obligates a maritime employer to pay for the lost wages, medical care, food, lodging, and other incidental expenses of a mariner who falls ill or is

---

[117]  (Trial Tr. (Day I) at 85, 107-08.)

[118]  (*Id.* at 86, 91, 107.)

[119]  (*Id.* at 88.)

[120]  (*Id.* at 90, 108.)

[121]  (*Id.* at 108.)

injured while in the service of a vessel.[122]  The duty is
practically absolute.  Unlike an employer's duties under the
Jones Act, liability for maintenance and cure is not predicated
on fault or negligence.[123]  Because the duty is so broad,
maintenance and cure has been compared to mandatory
employer-provided health and accident insurance.[124]

In keeping with the absolute nature of the right, a
plaintiff's burden of proof on a maintenance and cure claim is
slight:  he need establish only that he was injured or became ill
while "subject to the call of duty as a seaman."[125]  It is not
necessary for the plaintiff to show that his injury or ailment
originated during the term of his employment.  The employer may
be liable even for pre-existing conditions that manifest
themselves during the voyage.[126]  Generally, the maritime

---

[122]  *See Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724,
730 (1943); *The Osceola*, 189 U.S. 158, 175 (1903).

[123]  *Aguilar*, 318 U.S. at 730.

[124]  *See Lindquist v. Dilkes*, 127 F.2d 21, 23-24 (3d Cir.
1941) ("Both the shipowner and the insurer assume an obligation
whose burden may depend upon the physical condition of the
assured and the seaman.  The company gets a cash consideration;
the shipowner only a contented mariner."); G. Gilmore & C. Black,
*The Law of Admiralty* 281-82 (2d ed. 1975).

[125]  *Aguilar*, 318 U.S. at 732; *see also* 1 Thomas J.
Schoenbaum, *Admiralty and Maritime Law* § 6-28 (4th ed. 2004);
Fifth Circuit Pattern Jury Instructions: Civil § 4.11 (2006 ed.).

[126]  *See Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 212
(5th Cir. 2006) (*per curiam*) ("A seaman may recover maintenance
and cure even for injuries or illnesses pre-existing the seaman's

employer's obligation to provide maintenance and cure ends when a doctor provides a qualified medical opinion that plaintiff has reached maximum medical improvement.[127]  A seaman reaches maximum medical improvement when it appears "probable that further treatment will result in no betterment in the claimant's condition."[128]  "[A]mbiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seaman."[129]

There are defenses to a claim for maintenance and cure, but they "are few and narrowly applied."[130]  First, a seaman who causes his own injury through "some wilful misbehavior or deliberate act of indiscretion" is not entitled to receive maintenance and cure.[131]  As the Supreme Court has emphasized,

_____

employment unless that seaman knowingly or fraudulently concealed his condition from the vessel owner at the time he was employed.").

[127]  *See, e.g.*, *Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987) (explaining that the question of whether a seaman is entitled to continued maintenance turns on whether the individual seaman has reached maximum cure).

[128]  *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996).

[129]  *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 374 n.2 (5th Cir. 1981).

[130]  *Silmon v. Can Do II, Inc.*, 89 F.3d 240, 242 (5th Cir. 1996).

[131]  *Aguilar*, 318 U.S. at 731; *see also* Rules of Oleron, art. 6, reprinted in 2 *The Black Book of the Admiralty* 217 (Sir Travers Twiss ed. & trans., London, Longman & Co. 1873); *Abbott*

however, the seaman's behavior must be "positively vicious" before he will be denied maintenance and cure.[132]  Negligence or contributory negligence will not itself qualify as misconduct and forfeit the right.[133]

Second, under *McCorpen v. Central Gulf S.S. Corporation*,[134] a seaman who willfully conceals a pre-existing injury from his employer may not recover damages for maintenance and cure if that injury is reactivated or aggravated during a later voyage.[135]  A maritime employer who seeks to invoke the *McCorpen* defense must prove that: (1) the claimant intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts were

---

[132]   *on Shipping* 258-59 (J.C. Perkins ed., Boston, Little & Brown 1846).

[132]   *Warren v. United States*, 340 U.S. 523, 528 (1951).

[133]   *See Farrell v. United States*, 336 U.S. 511, 517 (1949) (holding that seaman whose injury was "due to no negligence but his own" was nevertheless "entitled to the usual measure of maintenance and cure at the ship's expense"); *Aguilar*, 318 U.S. at 731 ("Conceptions of contributory negligence, the fellow-servant doctrine, and assumption of risk have no place in the liability or defense against [a claim for maintenance and cure]. Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection.").

[134]   396 F.2d 547 (5th Cir. 1968).

[135]   *See id*. at 549; *see also Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005) ("An employer is allowed to rely on certain legal defenses to deny [maintenance and cure] claims.  One such defense is that the injured seaman willfully concealed from his employer a preexisting medical condition."); 1B Michael F. Sturley, *Benedict on Admiralty* § 46 (2008).

material to the employer's decision to hire the claimant; and (3) a connection exists between the withheld information and the injury complained of in the lawsuit.[136]

### 2. Findings

Because Savarese injured his knee while in the service of a vessel, he was entitled to maintenance and cure until the point of maximum medical cure for that injury.[137] The point at which a seaman has reached maximum medical cure is a medical determination, not a judicial one.[138] Hontas, the physician responsible for treating Savarese's knee, testified that Savarese's knee reached maximum medical cure as of June 1, 2009 at the latest.[139] Pearl River paid Savarese maintenance from

---

[136] *McCorpen*, 396 F.2d at 548-49; *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 301 (5th Cir. 2008); *Brown*, 410 F.3d at 171; *Jenkins v. Aries Marine Corp.*, 590 F. Supp. 2d 807, 812-14 (E.D. La. 2008); *Parker v. Jackup Boat Serv., LLC*, 542 F. Supp. 2d 481, 493-95 (E.D. La. 2008).

[137] *See Aguilar*, 318 U.S. at 730 (explaining that a shipowner's responsibility for maintenance and cure is in no way predicated on fault or negligence); *Springborn v. Am. Commer. Barge Lines, Inc.*, 767 F.2d 89, 95 (5th Cir. 1985) (noting that the cut-off date for maintenance and cure is not the point at which a seamen recovers sufficiently to return to work, but, rather, the date of maximum possible cure).

[138] *Rashidi*, 96 F.3d at 128 ("Whether a seaman has reached maximum medical cure is a medical question, and thus we review the district court's findings for clear error.") (internal citation omitted).

[139] (Trial Tr. (Day II) at 15, 25-26.)

November 2008 through mid-July 2009,[140] and also paid medical bills associated with Savarese's knee treatment.[141] As such, the Court finds that Pearl River satisfied its maintenance and cure obligation with respect to Saverese's knee.[142]

At trial, Savarese suggested that Pearl River had not yet paid a $1,760 anesthesia bill in connection with Savarese's knee surgery.[143] Savarese presented no competent evidence, however, that the bill was in fact unpaid or that it had been presented for payment. Warriner testified that "there's no reason that it would not have been paid," and she was not aware of such an unpaid invoice.[144] The Court finds that Savarese has not demonstrated by a preponderance of evidence that Pearl River failed to pay the $1,760 anesthesia bill.

With respect to Savarese's neck and back conditions, the Court finds that Pearl River has proved the three elements of the *McCorpen* defense.[145] First, there is no question that Savarese intentionally misrepresented or concealed medical facts. The

---

[140]   (Trial Tr. (Day I) at 85, 107-08.)

[141]   (*Id.* at 86, 91, 107.)

[142]   *Breese*, 823 F.2d at 104 ("The question of whether a seaman is entitled to maintenance turns on whether the individual seaman has reached maximum cure.").

[143]   (*Id.* at 87; Pl.'s Ex. 6.13.)

[144]   (Trial Tr. (Day I) at 87, 107.)

[145]   *Brown*, 410 F.3d at 171.

intentional concealment prong of the *McCorpen* test does not require a finding of subjective intent.[146] "Failure to disclose medical information in an interview or questionnaire that is obviously designed to elicit such information [ ] satisfies the 'intentional concealment' requirement."[147] Savarese has a documented history of problems at level L4 of his lumbar spine, low back pain, and neck problems resulting from earlier accidents. He complained to doctors of radiating pain from his back down his leg and said that he could not sit down.[148] At one point Savarese was "unable to move his neck back to its normal position."[149] These past injuries affected the same body parts that Savarese now claims he injured, namely, his neck and back. Yet Savarese stated on his medical evaluation form that he did not have and never did have back trouble or a neck, head, or spinal injury.[150] Savarese acknowledged at trial that these responses were untrue.[151] Thus, the Court concludes that the intentional concealment prong of the *McCorpen* test has been met.

---

[146]   *Id.* at 174.

[147]   *Id.* (citation omitted).

[148]   (Trial Tr. (Day I) at 220, 222-23; Def.'s Ex. 35.)

[149]   (*Id.* at 215; Def.'s Ex. 48.)

[150]   (Trial Tr. (Day I at 229-30; Pl's Ex. 2.)

[151]   (Trial Tr. (Day I) at 232.)

Second, the Court finds that Saverese's undisclosed injuries were material to Pearl River's decision to hire him. "The fact that an employer asks a specific medical question on an application, and that the inquiry is rationally related to the applicant's physical ability to perform his job duties, renders the information material for the purposes [of the *McCorpen* defense]."[152] Savarese indicated on his pre-employment medical evaluation form that he did not have and never did have back trouble or a neck, head, or spinal injury.[153] While the evaluation was administered by Pelican Urgent Care, Warriner testified that the form was the same as the one Pearl River would have given Savarese had he not already undergone a physical several days before.[154] Warriner further testified that Pearl River reviewed and relied on Savarese's representations in hiring him and in determining that Savarese was capable of performing heavy manual labor.[155] Because the non-disclosed facts were

---

[152] *Brown*, 410 F.3d at 175; *Jenkins*, 590 F. Supp. 2d at 812 (citing *Brown*); *see also Jauch*, 470 F.3d at 212-13 (holding that the shipowner had "clearly met" the *McCorpen* test, in part, because plaintiff was required to complete a medical questionnaire specifically designed to elicit information about past injuries or health problems and plaintiff concealed instances of back injury and mental health problems, which would have either prevented or delayed his employment).

[153] (Trial Tr. (Day I) at 229-30; Pl.'s Ex. 2.)

[154] (Trial Tr. (Day I) at 97-98; Pl's Ex. 2.)

[155] (Trial Tr. (Day I) at 98-99.)

rationally related to determining whether Savarese had the

physical capacity to perform the job, and Pearl River based its

hiring decision, at least in part, on Savarese's

misrepresentations, Pearl River has established that Savarese's

non-disclosed injuries were material for the purposes of

*McCorpen*.[156]

Finally, the Court finds that a "connection" exists between

the non-disclosed information and the injury complained of in the

lawsuit.[157]  The Fifth Circuit has "routinely found" that a causal

link exists where the plaintiff claims an injury "to the exact

same [*sic*] area . . . as was previously injured."[158]  Savarese

---

[156]     *Jauch*, 470 F.3d at 213 ("Past instances of back injury,
some severe enough to require extensive treatment, are certainly
facts material to Nautical's decision to hire Jauch as a
deckhand."); *Brown*, 410 F.3d at 175 (noting that the shipowner
based its hiring decision, at least in part, on whether the
plaintiff had past or present injuries); *Jenkins*, 590 F. Supp 2d
at 813 (same); *Parker*, 542 F. Supp. 2d at 494 (finding non-
disclosure material because the shipowner "arguably based its
hiring decision, at least in part, upon whether the applicant had
a prior neck injury").

[157]     *Brown*, 410 F.3d at 171.

[158]     *Id.* at 176-66 (holding that employer had established a
"causal relationship" between the plaintiff's prior back injuries
and the herniated disc injury that was at issue in the litigation
because the old and new injuries "were to the same location of
the [plaintiff's] lumbar spine"); *see also Jauch*, 470 F.3d at
212-13 (finding the requisite connection where the new back
injury was "virtually identical" to previous back injury);
*Johnson v. Cenac Towing, Inc.*, 599 F. Supp. 2d 721, 728-29 (E.D.
La. 2009) (explaining that the "same body part" test is not a
causation analysis); *Jenkins*, F. Supp. 2d at 813 ("To find a
requisite 'connection,' courts have looked to whether the
injuries were identical or produced identical or substantially

withheld information that he had suffered a number of neck and back injuries in the past,[159] and he now seeks maintenance and cure for injuries to his neck and back.  Accordingly, Savarese is not entitled to maintenance and cure for those conditions.

**C.    Negligence and Unseaworthiness**

The Court addresses Savarese's Jones Act negligence and unseaworthiness claims together because they each fail for a similar reason.

1.    Applicable Law

The Jones Act "provides a cause of action in negligence for 'any seaman' injured 'in the course of his employment.'"[160]  A maritime negligence action has essentially the same elements as common law negligence:  a plaintiff must "demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury."[161]  The causation requirement under the Jones Act is

---

similar symptoms in the same part of the body.").

[159]    (Trial Tr. (Day I) at 229-30; Pl's Ex. 2.)

[160]    *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995) (quoting 46 U.S.C. § 30104)).

[161]    *See Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000).

liberal. "If the defendant's negligence played any part, however small, in producing the seaman's injury, it results in liability."[162]  Even under this standard, however, "cause, in fact, is still a necessary ingredient of liability."[163]

The duty of seaworthiness requires a shipowner "to furnish a vessel and appurtenances reasonably fit for their intended use."[164]  A shipowner's duty to provide a seaworthy vessel is absolute and nondelegable.[165]  Liability for an unseaworthy condition "does not in any way depend upon negligence or fault or blame,"[166] although a plaintiff must demonstrate that the unseaworthy condition "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of

---

[162]  *Brister v. A.W.I., Inc.*, 946 F.2d 350, 354 (5th Cir. 1991); *see also Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62 (5th Cir. 1982) ("Defendant must bear responsibility if his negligence played any part, even the slightest, in producing the injury.").

[163]  *Chisholm*, 679 F.2d at 62.

[164]  *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960) (explaining that the standard "is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service") (citing *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336 (1955)).

[165]  *Brister*, 946 F.2d at 355.

[166]  *Bommarito v. Penrod Drilling Corp.*, 929 F.2d 186, 189 n.2 (5th Cir. 1991).

the unseaworthiness."[167]  The standard of causation for

unseaworthiness is somewhat "more demanding" than for Jones Act

negligence "and requires proof of proximate cause."[168]


    2.  Findings

    Under any applicable standard of causation, Savarese has not

demonstrated that Pearl River's negligence or the unseaworthy

condition of the TLC caused his injuries.

    As a preliminary matter, Savarese is not a credible witness.

Savarese has a "bad memory," which he attributes to his history

of drug use.[169]  He said he did not remember "most of his life."[170]

Savarese was addicted to "all drugs" from at least 1999-2004,[171]

and his drug addiction has repeatedly caused him to lie about his

medical conditions.[172]  Savarese would exaggerate his medical

complaints "as much as [he] could to get as much pain medicine as

[he] could."[173]  Savarese "relapsed" after his accident in

---

[167]  *Brister*, 946 F.2d at 355 (quoting *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988)).

[168]  *Chisholm*, 679 F.2d at 62.

[169]  (Trial Tr. (Day I) at 180-81, 191-92.)

[170]  (*Id.* at 192.)

[171]  (*Id.* at 148, 170, 177, 208.)

[172]  (*Id.* at 171, 183-85, 229, 231-32.)

[173]  (*Id.* at 171.)

November 2008 and is currently addicted to Lortab.[174]  Savarese

testified that his drug problem "needs some serious attention at

this point in time."[175]  Savarese's history of exaggerating

injuries to receive pain medication is evidence of a drug seeking

motive for asserting injuries in this case.

Moreover, Savarese has offered widely different stories of

how he was injured.  Immediately after the accident, Williams and

Poche each heard Savarese say that he jumped or dove away from

the crane.[176]  At the emergency room shortly after the accident,

Savarese stated that he was thrown against the cabin.[177]  In a

visit with Dr. Hontas on November 19, 2008, Savarese stated that

the crane boom caused him to hit a water cooler and the living

quarters.[178]  At a visit with a physical therapist on December 1,

2008, Savarese stated that he jumped out of the way and was

bounced as the load fell onto the platform.[179]  At a visit with

Dr. Shamsnia on December 6, 2008, Savarese reported that he was

pushed against a wall and lost consciousness.[180]  At a visit with

---

[174]    (*Id.* at 172, 176-78.)

[175]    (*Id.* at 172.)

[176]    (*Id.* at 27, 60-62, 70.)

[177]    (Def.'s Ex. 31.)

[178]    (Trial Tr. (Day II) at 21.)

[179]    (Def.'s Ex. 23 at 392.)

[180]    (Def.'s Ex. 24 at 522.)

Dr. Jackson on April 1, 2009, Savarese reported that he was bounced up in the air, broke both his knees, and was sprayed with diesel fuel.[181]  In short, these stories are inconsistent with each other, and they are also inconsistent with Savarese's testimony at trial that he tripped and fell on his way out of the galley door.[182]

As a matter of fact, the Court specifically finds that Savarese did not fall, as he testified.  Dark, the only eyewitness, contradicted Savarese's account.  Dark saw Savarese run out of the galley and go between the living quarters and the water tank without falling.[183]  The Court disbelieves Savarese's testimony that he fell as he was exiting the galley door.

It is possible that Savarese injured himself in some way as a result of this incident, but the Court need not speculate about that.  The falling boom did not hit Savarese or the galley, and it fell 10 to 15 feet away.  The standard of causation may be light for Jones Act negligence claims, but it is the plaintiff's burden to show how he was injured and relate the injury to the defendant's negligence or the unseaworthy condition of the vessel, and Savarese has not met this burden.

---

[181]   (*Id.* at 542.)

[182]   (Trial Tr. (Day I) at 153.)

[183]   (Dark Dep. Tr. at 16-17, 33, 57.)

Finally, the Court notes that its decision is not inconsistent with its conclusion that Savarese is entitled to maintenance and cure for his knee injury. Although Savarese has failed to demonstrate what *caused* his knee injury, the evidence demonstrates that his knee was in fact injured while he was on the TLC. Savarese had a bloody knee shortly after the accident and complained of pain contemporaneously. For maintenance and cure, it does not matter whether Pearl River caused Savarese's injury; it matters only that Savarese was injured while "subject to the call of duty as a seaman."[184] Because Savarese injured his knee while he was on the TLC, he is entitled to maintenance and cure. But because Savarese failed to demonstrate *how* his knee was injured, he is not entitled to recover under theories of negligence and unseaworthiness.

## II. CONCLUSION

For the reasons stated, after considering the evidence and testimony presented by the parties at trial, the Court concludes that Savarese is not entitled to any damages from Pearl River. The parties shall bear their own costs.

IT IS SO ORDERED.

---

[184] *Aguilar*, 318 U.S. at 732.

New Orleans, Louisiana, this 14th day of September, 2010.


_____
                SARAH S. VANCE

        UNITED STATES DISTRICT JUDGE